IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| Joe Angel Gomez, *individually and as next friend of* J.L.G. *and* J.A.G., *minors and as representative of the* Estate of Linda Olivarez, *deceased, and* Antonia Olivarez, *individually and as next friend of* F.F. and J.O., *minors, and* Gilbert Olivarez, *individually and each as heir to* Linda Olivarez,<br><br>Plaintiffs,<br><br>v.<br><br>Ford Motor Company, Key Safety Restraint Systems, Inc., *a/k/a* Key Safety Systems, Inc., *and f/k/a* Breed Technologies, Inc.,<br><br>Defendants. | §§§§§§§§§§§§§§§§§§ Case Number: 5:15-cv-00866-DAE |

## DEFENDANT FORD MOTOR COMPANY'S MOTION FOR ENTRY OF PROTECTIVE ORDER TO GOVERN PRODUCTION OF PROPRIETARY, TRADE SECRET AND COMMERCIALLY SENSITIVE MATERIALS

COMES NOW Defendant Ford Motor Company ("Ford"), by and through counsel, and pursuant to FED. R. Civ. P. 26(c)(1)(G) seeks an order protecting the use and dissemination of proprietary, trade secret and commercially sensitive materials and information to be produced by the parties in this action, respectfully showing this Court as follows:

### INTRODUCTION

**A.      Relief Sought**

In this Motion, Ford respectfully asks this Honorable Court to enter a protective order to govern the use and dissemination of proprietary, trade secret and commercially sensitive information produced by the parties in this action. Ford proposes that the Court enter a slightly modified version of the Western District's Form Protective Order. *See* Exhibit "A". Ford's

modifications do not alter the letter or spirit of the Form Protective Order. Rather, these modifications simply enhance certain portions of the Order to better fit the needs of this complex product liability action. To be clear, Ford's proposed modifications are more clearly set forth in the attached redline version of the Western District's Form Protective Order. *See* Redline Version of Ford's Proposed Protective Order, attached hereto as Exhibit "A" formerly filed as Exhibit "B" to Dkt. No. 36).

For their part, Plaintiffs' do not dispute that a Protective Order should be entered, nor do Plaintiffs' challenge the confidential designation of any specific Ford produced document. However, as an alternative, Plaintiffs ask the Court to diverge rather drastically from the Western District's Form Order and, instead, enter an order that was allegedly agreed to by Defendant Key Safety Systems, Inc. ("KSS") in the Connecticut state court matter of *Vetrano v. Key Safety Systems, Inc., et. al.,* Docket No. FST-CV-12-6012155-S. *See* Dkt. No. 28, Exh. 3. ("*Vetrano* Order"). The most pronounced departure of the *Vetrano* Order from the Court's Form Protective Order is that the *Vetrano* Order does not provide for the parties to assert non-sharing protection over certain highly commercially sensitive documents and materials. The ability to assert non-sharing confidentiality is absolutely imperative in this matter.[1] Equally as important, Plaintiffs ask the Court to apply the *Vetrano* Order to production by both Ford and KSS despite the fact

---

[1] The vast majority of documents and information to be produced by Ford will either not be protected or will be subject to sharing protection whereby Plaintiffs may provide these documents to attorneys involved in cases with the same vehicle and similar allegations of defect. Ford typically will assert sharing protection over documents and information that are revealing of Ford's internal business practices and procedures but that do not necessarily relate to current production or advanced research and technologies.

Ford will typically designate a much smaller subset of documents subject to a non-sharing protective order. These type documents are non-sharing because they reveal Ford's business practices and procedures for current production or relate to advanced research projects or technology. In these instances, Ford considers such documents and information to be of such a highly sensitive and proprietary nature that their dissemination must be confined to the case at hand.

2

that Ford was not a party to the *Vetrano* matter and did not sign or agree to the *Vetrano* Order. There is simply no justifiable reason for this Court to deviate so significantly from the Western District's Form Protective Order.

Therefore, Ford seeks entry of the modified version of the Court's Form Order attached as Exhibit "A". In the alternative, Ford asks the Court to enter the Western District's Form Protective Order without modification.

**B.** **Background Facts**

This is a complex product liability action in which Plaintiffs allege that Decedent Linda Olivarez ("Decedent") sustained fatal injuries in a rollover crash which occurred on December 28, 2013 due to alleged defects in her 2003 Ford Explorer. Despite being sophisticated and well versed in litigation against Ford, Plaintiffs' counsel are engaged in what can only be described as a "shotgun" approach to their alleged defects and discovery as to Ford. Indeed, despite Plaintiffs' counsel having represented clients against Ford alleging similar allegations as the ones herein, Plaintiffs' discovery requests have so far called for Ford to agree to produce numerous documents that relate to the following alleged defects: (1) Glass/Glazing; (2) Seat Belt Restraint Systems; (3) Side Impact and Rollover Canopy Air Bags; (4) Electronic Stability Control; (5) General Crashworthiness and Ejection Mitigation; and, (6) Warnings.

To satisfy its discovery obligations related to these numerous components and theories, Ford has agreed to produce, among other types of documents, the following types of highly confidential and commercially sensitive trade secret information that must be subject to a non-sharing protective order: (1) System and Sub-System Design Specifications; (2) Certain documents contained in Ford's Safety Canopy Compilation, including Calibration Sign-Off Reports; (3) Certain documents contained within Ford's Generic Roof Crush Collection, such as

3

confidential government presentations; and, (4) Certain documents contained in Ford's Electronic Stability Control Compilation. *See* Declarations of Steven Beane, Ram Krishnaswami, and Michael Leigh attached hereto as Exhibits "B", "C" and "D", respectively. Many other documents that Ford agreed to produce are either subject to a sharing protective order, or are no longer protected as confidential business information. Finally, since this matter is in the early stages of discovery, it is anticipated that Ford will be asked to produce additional documents in the future that are subject to either sharing or non-sharing protection.

**B.    Procedural History**

Since January 2016, Ford has attempted to negotiate a protective order to govern the production of Ford's confidential and proprietary documents in this case with Plaintiffs' counsel. In particular, Ford offered Plaintiffs three (3) separate protective order options to govern production and dissemination of Ford's proprietary, trade secret and commercially sensitive documents and information in this matter. Although Plaintiffs' claim in a recent filing with the Court that they attempted to meet and confer in good faith, Ford maintains that Plaintiffs never truly responded with any viable option to Ford's first two proposals because in both instances, Plaintiffs summarily rejected the concept that non-sharing protection must be accorded to some of Ford's production documents and information. Likewise, to Ford's knowledge, Plaintiffs never responded to Ford's proposal of the modified Western District Form Protective Order discussed more fully herein.

Importantly, ***none*** of Ford's proposals will inhibit the Plaintiffs' ability to receive or use information for purposes of litigating the case at bar. Therefore, ***none*** of Ford's proposed protective orders will prejudice Plaintiffs, in any way, during this case.

4

The first proposed order, which was offered on **January 27, 2016**, contained both a sharing provision and a non-sharing provision.[2] Plaintiffs' counsel summarily rejected the non-sharing language. *See* Correspondence with Plaintiffs' counsel, including attachments, attached hereto collectively as Exhibit "E". To alleviate Plaintiffs' concerns, Ford offered the alternative that an agreed protective order would include a sharing provision but also reserve the right for Ford to seek non-sharing protection should such protection become necessary based on Plaintiffs' discovery in this case. Plaintiffs' counsel rejected this proposal. Ford then made a third offer to Plaintiffs' counsel in an attempt to resolve the issue without court intervention. Exh. "E". Ford's third proposed protective order was the Western District's Form Protective Order with some slight modifications to address issues that Ford anticipated could arise in this type litigation. *See* Exh. "A". Plaintiffs' counsel did not even respond to this proposal until after Ford filed its objection to entry of the *Vetrano* order and after Plaintiffs' served an untimely and objectionable deposition notice.[3]

Ford's proposed protective order is in the form set out in Appendix H of the Local Rules for the Western District of Texas and approved by Rule CV-26(c) of the Western District, with the following additions:

---

[2] The vast majority of documents and information to be produced by Ford will either not be protected or will be subject to sharing protection whereby Plaintiffs may provide these documents to attorneys involved in cases with the same vehicle and similar allegations of defect. Ford will designate other documents subject to a non-sharing protective order. These type documents are non-sharing because Ford considers such documents and information to be of such a highly sensitive and proprietary nature that their dissemination must be confined to the case at hand.

[3] As a practical matter, the original protective order proposed by Ford best meets the needs expressed by all of the parties by allowing for sharing and non-sharing protection. It also best meets the needs for judicial efficiency because it does not require additional leave of Court for Ford to designate its smaller subset of non-sharing production. Plaintiffs' proposed *Vetrano* order on the other hand is the least efficient and proper proposal because, among other issues, it only contemplates sharing protection, which is in direct conflict with the Western District's Non-Sharing Form Protective Order.

1. <u>Paragraph 5</u>:

    Allows Defendants to designate "Classified Information" by stamping the materials with "other similar language" as what is set forth in the Form Order. This type language would include, but not necessarily be limited to: "Subject to Protective Order" or "Produced Subject to a Non-Sharing Protective Order."

2. <u>Paragraph 8</u>:

    Adding the following language to ensure there is no confusion about potential waiver for Inadvertent Disclosure of documents or information:

    "Inadvertent disclosure of Classified Information does not constitute a waiver of any claim of confidentiality as set forth in this Protective Order or any other matter in any jurisdiction, unless ordered by the Court."

    Also adding the following language to further clarify the handling of unauthorized disclosure of Confidential Information:

    "Within fourteen days of learning of the unauthorized disclosure of the Confidential information or For Counsel Only information, the receiving party shall either: (a) return the Confidential information or For Counsel Only information to the producing party; or, (b) securely destroy the Confidential information or For Counsel Only information and certify such destruction to the producing party."

3. <u>Added New Paragraph 10</u>:

    Consistent with a recently released Best Practices Guidance Bulletin by the National Highway Traffic Safety Administration, Ford added the following new Paragraph 10:

    "a.     This protective order shall not be construed to prohibit Ford's disclosure or production of safety-related information to a regulatory agency or governmental entity with an interest in the safety-related information. Material subject to this protective order may only be disclosed to a regulatory agency or governmental entity with an interest in the safety-related information by Ford, and such disclosure shall be made pursuant to 49 CFR 512 or similar applicable rules.

    b.     If other parties to this protective order have a reasonable belief that certain documents are safety-related and need to be disclosed to a regulatory agency or governmental entity, they are not prohibited from advising the regulatory agency or governmental entity that they believe such documents were produced in this case, however, any disclosure of such documents shall adhere to the procedure described in Paragraph 10(a)."

    4.    <u>Paragraph 11 (formerly Paragraph 10)</u>:

Adding the following language to clarify the process for designating a transcript or portions of a transcript to be subject to the Protective Order in the event Confidential Information is used during the examination of the witness:

"The portion of the transcript referencing Classified Information shall be so designated (i) by a statement to such effect on the record during the proceeding in which the testimony is received, or (ii) by written notice served on counsel of record in this Litigation within thirty (30) business days after the receipt of the draft or final transcript (whichever is received earlier) of such proceeding (as used herein, the term "draft transcript" does not include an ASCII or rough transcript). However, before such thirty (30) day period expires, all testimony, exhibits and transcripts of depositions or other testimony shall be treated as Confidential information. All portions of transcripts not designed as Confidential within the time frame provided herein shall be deemed not confidential"

    5.    <u>Paragraph 18 (formerly Paragraph 17)</u>:

Adding the following language to clarify the terms or scope of the Protective Order:

"This Protective Order shall be binding upon the parties hereto, upon their attorneys, and upon the parties' and their attorneys' successors, executors, personal representatives, administrators, heirs, legal representatives, assigns, subsidiaries, divisions, employees, agents, independent contractors, or other persons or organizations over which they have control."

As stated, Plaintiffs do not dispute a protective order designed to protect the confidentiality of the parties' documents and information is appropriate in this case. Therefore, the issue this Court must determine is the scope and degree of protection necessary for certain highly commercially sensitive and proprietary information related to certain of Ford's documents and information. Plaintiffs have shown no good cause, as required by Local Rule CV-26(c), as to why the scope and degree of protection outlined in the Court's approved Form Protective Order should not govern in this case and instead request an order that provides for the sharing of all of the parties' proprietary, trade secret and commercially sensitive documents and information. Moreover, Plaintiffs fail to adduce any argument or proof that the entry of the Court's Form Order would in any way hinder their ability to litigate their claims. Instead,

7

Plaintiffs simply take the position that because KSS allegedly agreed to a protective order in an unrelated Connecticut state court action; therefore this Court should enter the same order in this case against a Defendant (Ford) that was not a party to Plaintiffs' proposed order and which is inconsistent with the protection afforded by the Western District's Form Order.

Ford asserts that the Western District balanced all the relevant interests when establishing as approved the form order of Rule CV-26(c), the District's preferred form, of which Ford's proposed order is based and because Plaintiffs have failed to meet any burden of good cause, Ford requests this Court enter Ford's proposed Protective Order.

## ARGUMENT & CITATION TO AUTHORITIES

**A.     Standard for Granting Non-Sharing Protective Order.**

The Federal Rules of Civil Procedure govern the issuance of protective orders and provide that:

> A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending. . . . The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>
> (G) requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way.

*See* FED. R. Civ. P. 26(c)(1)(G).

Federal Rule of Civil Procedure 26(c) "confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times v. Rhinehart*, 467 U.S. 20, 36, 104 S.Ct. 2199, 2209, 81 L.Ed.2d 17 (1984). Moreover, Rule 26(c)(1)(G) broadly protects not only trade secrets but also an array of other confidential information. The United States Supreme Court has construed this language to cover more than just trade secrets. In *Federal Open Market Committee of the Federal Reserve System v. Merrill,* a law student sought disclosure from a government agency of it Record of Policy Actions. *See*

8

443 U.S. 340, 346-47, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979). Although these government records were not trade secrets, the agency argued that they constituted confidential commercial information and were subject to protection under federal case law and procedural rules. *Id.* At 356, 99 S.Ct. 2800. The Court found that the government records were commercial information because they related to buying and selling securities, and they were confidential because the agency kept them secret for a month before disclosure. *Id.* At 361, 99 S.Ct. 2800. The Court wrote that a protective order under Rule 26(c) may be warranted for such confidential commercial information. *Id.* At 357, 99 S.Ct. 2800.

Courts consistently allow for the issuance of a non-sharing protective order for trade secret, proprietary, or confidential information upon a showing of good cause and, in most federal circuit courts, a showing by the requesting party of a clearly defined and very serious injury. *See, e.g., Anderson v. Cryovac*, 805 F.2d 1, 7 (1st Cir. 1986) (allowing non-sharing protective order for good cause shown); *Bridge C.A.T. Scan Ass'n v. Technicare Corp.*, 710 F.2d 940, 944-45 (2d Cir. 1983) (same); *Publicker Indus. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984) (good cause is established by demonstrating "a clearly defined and serious injury on the moving party"); *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003) (requiring showing of good cause and specific prejudice or harm if no order is granted); *McCarthy v. Barnett Bank of Polk Cty.*, 876 F.2d 89, 91 (11th Cir. 1989) (party seeking protective order has burden of showing good cause); *U.S. ex rel. Purcell v. MWI Corp.*, 209 F.R.D. 21, 28 (D.D.C. 2002) (same).

Ford's motion for an order that provides non-sharing protection demonstrates that good cause justifies the entry of such an order, and therefore Ford's Motion should be granted.

B.  **Certain of Ford's Documents and Information Deserve Non-Sharing Protection Because They Consist of Trade Secrets Pursuant to Texas and Federal Law.**

"Courts dress technical information with a heavy cloak of judicial protection because of the threat of serious economic injury to the discloser of scientific information." *Andrx Pharmaceuticals, LLC v. Glaxosmithkline*, PLC, 236 F.R.D. 583,586 (S.D. Fla. 2006), *quoting Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.*, 682 F. Supp. 20, 22 (D. Del. 1988) (recognizing "that proper safeguards should attend the disclosure of trade secrets").

Here, certain of Ford's documents should be protected from widespread dissemination because they contain technical, commercially sensitive, proprietary, and trade secret information, which, if disseminated without protection, could cause competitive injury to Ford.

Since this Court's jurisdiction is based upon diversity of the parties, state substantive law supplies the rule of decision, as Federal Rule of Evidence 501 requires that issues of privilege will be determined in accordance with Texas State trade secret privilege law:

> [I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

FED. R. EVID. 501. *See also In re Avantel*, 343 F.3d 311, 323 (5th Cir. 2003).

Texas law defines a "trade secret" as follows:

> A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it.

*Computer Assocs Int'l. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996).

Further, under Texas law, to establish that Ford's documents constitute protected trade secrets, the Court must examine: (1) the extent to which the information is known outside Ford; (2) the extent to which the information is known within Ford; (3) the extent measures are taken to protect secrecy; (4) the value of the information to Ford and its competitors; (5) the cost and

10

time to develop the information; and (6) the ease or difficulty to replicate the information. *See In re Bass*, 113 S.W.3d 735, 739-40 (Tex. 2003); *see also John Paul Mitchell v. Randalls Food Markets*, 17 S.W.3d 721, 737- 39 (Tex. App.—Austin 2000, pet. denied). Here, as established by the declarations of Steven Beane, Ram Krishnaswami and Michael Leigh, all of these requirements have been met. (See Exhibits "B", "C" and "D").[4]

In granting a non-sharing protective order, federal courts frequently limit disclosure to counsel and specified experts or other select individuals. *See, e.g., Multi-Core, Inc. v. So. Water Treatment Co.*, 139 F.R.D. 262, 264-65 (D. Mass. 1991); *Davidson Pipe Co. v. Laventhol & Horwath*, 120 F.R.D. 455 (S.D.N.Y. 1988); *Alloy Cast Steel Co. v. United Steel Workers of America*, 70 F.R.D. 687 (D.C. Ohio 1976), *opinion incorporated*, 429 F. Supp. 445 (N.D. Ohio 1977); *Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.*, 682 F. Supp. 20, 21-23 (D. Del. 1988); *Brittain v. Stroh Brewery Co.*, 136 F.R.D. 408, 412 (M.D.N.C. 1991); *Dart Drag Corp. v. Coming Glass Works*, 480 F. Supp. 1091, 1106-07 (D. Md. 1979).

In *Smith v. BIC Corp.*, 869 F.2d 194, 199 (3d Cir. 1989), plaintiffs served interrogatories and requests for production seeking information including design information and safety test results. *Id.* at 196. The defendant BIC objected, in part because the information sought was confidential or otherwise trade secret information, and moved for a protective order. *Id.* In support of its motion, BIC provided affidavits of its quality assurance manager and corporate

---

[4] This six factor standard for trade secret protection has also been adopted by a majority of federal jurisdictions. *See Chembio Diagnostic Systems, Inc. v. Saliva Diagnostic Systems, Inc.*, 236 F.R.D. 129, 136 (E.D. N.Y. 2006); see also *Deford v. Schmid Prods. Co.*, 120 F.R.D. 648, 653 (D. Md. 1987); *Waelde v. Merck, Shag) & Dohme*, 94 F.R.D. 27, 28 (D.C. Mich. 1981); *Andrew Corp. v. Rossi*, 180 F.R.D. 338, 340 (N.D. Ill. 1.998). In *Chembio*, the court held that the party seeking a non-sharing protective order must demonstrate that the information at issue is a trade secret or otherwise confidential under this six-factor rule, and that the harm caused by its disclosure outweighs the needs of the party seeking its disclosure. *Chembio*, 236 F.R.D. at 136. Once good cause is established, the party requesting the information must establish that the information is both relevant and necessary. *Id.* at 110.

counsel that stated that the information sought would reveal the corporation's trade secrets and cause the company competitive injury. *Id.* at 197. On appeal of the district court's denial of the motion for protective order, the Third Circuit reversed and ordered the production of the design and safety test result information only subject to a non-sharing protective order. *Id.* at 202. Applying the six factor test discussed above, the court held that the information was confidential information that was not known generally within the industry. *Id.* at 200. The court also held that the lower court's ruling that BIC prove its design information gave it a competitive advantage as part of its proof that the information was a trade secret was clearly erroneous under the applicable law. *Id.* The court stated that the fact that some of the design information was in the public domain and could be reverse engineered did not mean that all design information is not a trade secret. *Id.* at 201. Similarly, safety test information was also trade secret protected as a compilation of information used in the company's business. *Id.*

The documents for which Ford seeks non-sharing protection contain, among other things, information related to developing technologies, internal design standards and specifications, and internal test and development programs, the dissemination of which could cause significant damage to Ford's competitive position. As discussed with specificity below, the materials that Ford has designated "Subject to a Non Sharing Protective Order" constitute trade secrets as highly commercially sensitive information is not known generally within the industry and meets every element of the Texas law and the six-prong test used by a majority of federal jurisdictions. As such, Ford's Motion for an order that allows for non-sharing protection should be granted.

C.  **The ESC Compilation Deserves Non-Sharing Protection Because It Consists of Trade Secrets Pursuant to Texas Law**

AdvanceTrac®, is Ford's proprietary name for Electronic Stability Control ("ESC"). ESC is a complex system that has to be developed and tuned specifically for each vehicle and

platform on which it is offered. *See* Declaration of Steven Beane, at ¶3, attached hereto as Exhibit "B". It is not like a radio that can simply be unbolted from one vehicle and bolted onto another vehicle. Different vehicles, built on different platforms for different model years have different engines, dimensions, body weights, suspensions, wheel bases, track widths, tires, brakes and drive trains, all of which can affect the application, feasibility, tuning and performance of ESC. *Id.* In fact, at times ESC even has to be specifically tuned for different engines, transmissions or axle combinations offered on the very same model vehicle. *Id.* ESC is yaw stability control, which seeks to control the vehicle's movement in response to a driver's input. *Id.* at 4. Roll Stability Control (RSC) takes that science a step further to examine the roll characteristics of the vehicle. *Id.* RSC is a cutting edge technology that is exclusive to Ford and its licensees. *Id.*

The Electronic Stability Control Compilation ("ESC Compilation"), and/or documents contained therein, to be produced by Ford consists of research, engineering drawings, test reports, electronic mail, commercially sensitive supplier information and documents, meeting minutes, algorithms and cost information related to Ford's development of certain interactive vehicle dynamic systems including ESC, RSC and research related to future developments and improvements of those systems. *Id.* at 6-8. Documents contained within the ESC Compilation could be used to reconstruct these systems or provide competitors with information regarding the design, development, manufacturing and testing techniques used by Ford to Ford's competitive disadvantage. *Id.* at 7. Some of the documents are unprotected, some are subject to sharing protection, and some are highly sensitive documents that require non-sharing protection. Ford is not in any way trying to withhold the production of any documents within the ESC Compilation. Ford simply wants to protect against the dissemination of its confidential research, development

and/or commercial information, as well as its highly sensitive information relating to technology that is exclusive to Ford and its licensees, invention disclosures, protected supplier documents, and highly confidential cost information. *Id.*

The subject documents should be protected from dissemination because they contain technical, proprietary, and trade secret information, which, if disseminated without protection, could cause competitive injury to Ford. As indicated above, the documents for which Ford seeks a non-sharing protective order contain highly confidential and secret information related to exclusive technologies such as roll stability control and invention disclosures that could lead to product innovations giving Ford a competitive advantage. *Id.* at 7-9. If Ford's competitors obtained this information, they could use it to their own advantage without the time and expense put into developing the information that Ford incurred, and could take away Ford's competitive edge. *Id.* at 8.

In addition, Ford takes great care to protect the proprietary ESC Compilation from unwarranted disclosure. *Id.* at 10. Ford treats these documents as confidential proprietary information, and protects the secrecy of the ESC Compilation by placing practical limitations on the dissemination of the documentation to persons who need to know about it within Ford, which consist of only those Ford employees who are directly related to the work on these projects. *Id.* at 10. The ESC Compilation is not publicly available to Ford personnel, or to the public. *Id.* at 10.

**D.  Select Documents, Including Calibration Reports, Concerning Ford's Safety Canopy System Contain Trade Secret Information and Should Be Afforded Non-Sharing Protection**

Ford was the first automobile manufacturer to market with a side curtain airbag system tied to a rollover sensor. *See* Declaration of Ram Krishnaswami at ¶5, attached hereto as Exhibit "C". Ford continues to be an industry leader in this area. *Id.* Because the automobile industry is

highly competitive, being first to market with a new concept or new feature confers a distinct competitive advantage to an automotive manufacturer, which translates into sales and profits. *Id*. Research on product concepts may take several years and the design and development of a new concept generally takes several years. *Id*. If Ford's competitors were to gain access to the materials Ford seeks to protect, they would gain a significant competitive advantage, such as using Ford's work to get a product to market sooner than they otherwise would and at a lower cost because the competitor would not have incurred the substantial research, testing, and development costs that Ford had incurred. *Id*. The specific categories of Safety Canopy documents over which Ford seeks non-sharing protection are as follows.

Ford seeks non-sharing protection for documents related to Safety Canopy test methodology and protocol, including, but necessarily limited to, Calibration Reports. Because Ford was first to market with a feature such as the Safety Canopy, Ford spent a significant amount of time and money just developing the test methodology necessary to develop the rollover sensor that would ultimately be part of the Safety Canopy system. Such documents are included in the group of Safety Canopy documents and include specific information such as key test parameters and the output being measured. *Id.* at 6. These documents contain trade secrets and are critical to Ford's competitive edge in the market because if a competitor had access to such information, the competitor could bypass all of the time and expense involved in researching and developing the proper test parameters and outputs to measure. The test methodology represents a roadmap to a competitor for what tests need to be conducted, how to conduct the tests, and what criteria should be measured. This type of information is treated as confidential in the automotive industry and is kept as closely guarded secret information. *Id.* at 8.

### E. Ford's System and Sub-System Design Specifications Should Be Afforded Non-Sharing Protection

Ford also seeks to protect System and Sub-system Design Specifications ("SDSs") and other developmental documents that Ford contends should be produced subject to non-sharing protective order. The purpose of SDSs is to establish design, development and testing requirements of a vehicle's systems and sub-systems. *Id.* at 10. SDSs also describe, in detail, the methodology required to objectively achieve compliance by defining design verification methods and acceptance criteria applicable to Ford vehicles. *Id.* Ford currently and actively uses SDSs in its design and development process and does so outside of specific vehicle programs that have ended or gone out of production. *Id.*

Research, design and development methodologies, and testing described or shown in these type documents at issue is undertaken at great expense to Ford. *Id.* at 11. These efforts includes thousands of hours of work from Ford engineers who have a high level of specialized experience, education, and training in a particular field of automotive engineering. *Id.* The automotive industry is highly competitive, and being the first to market a new concept or feature can confer a distinct competitive advantage to an automotive manufacturer, translatable into sales and profits. *Id.* Research on product concepts may take several years, and the design and development of a new design concept generally takes several years. *Id.*

If Ford's competitors were to gain access to this documentation regarding Ford's SDSs and other development design documents, they would unfairly gain a competitive advantage against Ford. *Id.* at 12. Such an advantage would consist of using Ford's work in the development of their own designs and thus to get a product to market sooner than they would

16

have otherwise and/or to get their product to market at a lower cost, since they would not have incurred the substantial research, testing, and developmental costs that Ford had incurred, and since they would have received closely guarded information about Ford's costs and timetables for such designs. *Id.* Alternatively, whether or not a competitor actually utilized Ford's SDSs or other developmental documents in developing its own products, possessing information about these documents would give a competitor an advantage in everything from utilizing the research underlying Ford's design concepts in order to apply such research to the competitor's own potential design concepts (whether in comparison or contrast), and/or to undercutting Ford's timetables or costs by working from Ford's information regarding same and/or to developing marketing strategies that would contrast the competitor's own design concepts with Ford's based upon this information. *Id.*

The information contained in the SDSs is treated as trade secret in the automotive industry and is kept as closely guarded secret information. *Id.* at 14. SDSs in particular are highly commercially sensitive and must be subject to a non-sharing protective order. *Id.* at 17. Ford has at all times maintained the confidentiality of the information in these documents. *Id.* at 14. The work and information contained in the SDSs and these other developmental design documents are considered proprietary, and employees who deal with such information are required to treat such information as confidential. Ford protects the secrecy of the SDSs and the other developmental design documents by creating secure areas within Ford's premises with controlled access limited to those employees whose job functions require their presence in those areas. Ford further protects the secrecy of such work by practical limitations on the dissemination of the documents to those persons within Ford whose job duties require their knowledge of such documents. *Id.*

F.  **Select Documents Contained Within Ford's Generic Roof Crush Collection Contain Trade Secret Information and Should be Afforded Proprietary Protection**

Ford's Generic Roof Crush Collection consists of thousands of historical documents relating to Ford's testing and certification of roof crush standards on its motor vehicles. The documents describe potential future designs for passenger vehicle roof structures, including design concepts, cycle plans, timetables, and confidential manufacturing technologies. Documentation regarding potential future designs for passenger vehicle roof structures, including design concepts, cycle plans, timetables, and confidential manufacturing technology are considered trade secrets of Ford; in other words, such information is used in Ford's business of designing and manufacturing passenger vehicles and provides Ford with an opportunity to gain an advantage in that market over anyone who does not have such information. *See* Declaration of Michael Leigh at ¶8, attached hereto as Exhibit "D".

Ford undertakes a significant expense in designing passenger vehicle roof structures. *Id.* at 9. The automotive industry is highly competitive, and being first to market a new concept can offer a distinct competitive advantage that is translatable into sales and profits. *Id.* Research, design, and development can take place over a course of several years, and disseminating that information can cost Ford millions of dollars or save a competitor millions of dollars. *Id.* at 9-10.

The GRCC also contains documents submitted to NHTSA regarding FMVSS 216 rulemaking that constitute trade secrets. *Id.* at 12. Ford, in a letter to NHTSA (also included in Exhibit "D"), informed NHTSA that the materials it was submitting included some materials which were confidential, demonstrating Ford's "good cause" for maintaining the confidentiality of the documents. *Id.*

18

## CONCLUSION

Ford is entitled to a protective order that adequately protects the trade secret information that it is producing in response to discovery in this case. Ford has in good faith identified certain documents containing such highly proprietary and/or trade secret information that they should be subject to Non-Sharing Protection. Good cause exists to protect these documents from public dissemination, and therefore, a non-sharing protective order is appropriate. Therefore, Ford requests that this Court enter the modified Western District Form Protective Order proposed by Ford

WHEREFORE, PREMISES CONSIDERED, Ford respectfully requests that this Court enter its proposed protective order previously approved in the Local Rules of the Western District of Texas with slight modification, and deny Plaintiffs' request for entry of the unrelated *Vetrano* protective order.

Respectfully submitted,

BROCK PERSON GUERRA REYNA, P.C.
17339 Redland Road
San Antonio, Texas 78247
(210) 979-0100
(210) 979-7810 (FAX)

BY:_____
RICARDO R. REYNA
State Bar No. 16794845
Email: rreyna@bpgrlaw.com
GREG R. HOKENSON
State Bar No. 24036794
Email: ghokenson@bpgrlaw.com
17339 Redland Road
San Antonio, Texas 78247
(210) 979-0100
(210) 979-7810 (FAX)

ATTORNEYS FOR DEFENDANT,
FORD MOTOR COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of September, 2016, the foregoing document was served sending copies via facsimile to the following:

Michael R. De La Paz
Law Office of Michael R. De La Paz
601 Howard Street, 2nd Floor
San Antonio, Texas 78212
and
Kip Whittemore
Wolff Ardis, P.C.
5810 Shelby Oaks Drive
Memphis, Tennessee 38134-7315
*Attorney for Plaintiffs*

Mark J. Barrera
DYKEMA COX SMITH
112 East Pecan, Suite 1800
San Antonio, Texas 78205
*Attorneys for Defendant,*
**Key Safety Restraint Systems, Inc.,**
*a/k/a* **Key Safety Systems, Inc.,** *and*
*f/k/a* **Breed Technologies, Inc.,**

_____
RICARDO R. REYNA
GREG R. HOKENSON