# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JOE ANGEL GOMEZ, Individually and As Next Friend of J.L.G. and J.A.G., minors and As Representative of the Estate of LINDA OLIVAREZ, deceased, and ANTONIA OLIVAREZ, Individually and As Next Friend of F.F. and J.O., minors, and GILBERT OLIVAREZ, Individually, and Each as Heir to LINDA OLIVAREZ<br><br>         Plaintiffs,<br>v.<br><br>FORD MOTOR COMPANY, KEY SAFETY RESTRAINT SYSTEMS, INC., a/k/a KEY SAFETY SYSTEMS, INC. and f/k/a BREED TECHNOLOGIES, INC.,<br><br>         Defendants. | § § § § § § § § § § § § § § § § § § | Case No. 5:15-cv-00866-DAE |

## DECLARATION OF RAM KRISHNASWAMI

I, Ram Krishnaswami, declare as follows:

1. My name is Ram Krishnaswami. I am over the age of 18, have personal knowledge of the matters set forth in this Declaration unless otherwise stated. If called as a witness, I would be competent to testify to the matters in this Declaration. The facts stated in this Declaration are true and correct.

2. I received my Bachelor of Engineering in Mechanical and Production Engineering from Annamalai University, India in 1990, and my Master of Science in Material Science and Engineering from Wayne State University, Detroit in 1992, and my Master of Science in Engineering and Management from the Massachusetts Institute of Technology, Cambridge in 2006. I have been employed by Ford since 1993, either as a consulting engineer or product design engineer. During my employment at Ford, I have worked as an engineer. My

responsibilities included working on various systems like Body—Exterior and Interior, Chassis, and Fuel Systems. I have provided feedback to vehicle engineering teams during vehicle development. Currently, I am a Design Analysis Engineer. I have been in my present position since October, 2007. Design Analysis is part of Ford's Automotive Safety Office.

3. In this Declaration, I discuss certain proprietary, trade secret, and confidential information of Ford. In executing this Declaration, I do not intend to, and Ford has not authorized me to, waive any protections or privileges Ford may have as to proprietary, trade secret, and/or confidential information, as to attorney-client communications or information developed in anticipation of or in response to litigation.

4. The information I am describing in this Declaration includes documents that Ford has designated as "Subject to Non-Sharing Protective Order," or a similar designation, which includes materials that contain highly proprietary and confidential trade secret information relating to side curtain airbags and Ford's Safety Canopy® System ("the Safety Canopy documents"), specifically the Subsystem Design Specification and Calibration Reports, and also the System Design Specifications for the driver's side front window glass and glazing utilized in 2002-2005 Ford Explorer and Mercury Mountaineer (U152) vehicles. I have reviewed these documents and am familiar with their contents.

5. Ford was the first automobile manufacturer to market with a side curtain airbag system tied to a rollover sensor (Ford's Safety Canopy® System) and continues to be an industry leader in this area. Research, development, and testing described or shown in the documents at issue are undertaken at great expense to Ford, literally tens of thousands if not hundreds of thousands of dollars. The automotive industry is a highly competitive industry, and being the first to market a new concept or feature can confer a distinct competitive advantage to an

automotive manufacturer, translatable into sales and profits. Research on product concepts may take several years, and the design and development of a new design concept generally takes several years. The Safety Canopy documents at issue concern current technology that is still considered highly proprietary and commercially sensitive business information.

6. The Calibration Reports contain documents proprietary to Ford and to Ford's supplier, Autoliv. The Calibration Sign-off Reports identify the various crash test modes and corresponding vehicle impact speeds necessary to deploy the seat belt buckle pretensioner, airbags, and Safety Canopy for belted and unbelted front seat outboard occupants. The Calibration Sign-off Reports also specify the fire time window necessary to make a deployment decision for each type of crash. The Calibration Sign-off Reports are generated by Ford's RCM supplier, Autoliv, with input from Ford. Both Ford and Autoliv consider the information in this document to be confidential, highly proprietary, and commercially sensitive business information. These documents provide on their face that the information contained therein is confidential, proprietary, and the property of the supplier.

7. The Calibration Sign-off Reports contain confidential Safety Canopy airbag design and development methodology used in Ford's and Autoliv's business of designing and manufacturing passenger vehicles and provides Ford and Autoliv with an opportunity to gain an advantage in that market over anyone who does not have such information.

8. Airbag calibration information is treated as confidential in the automotive industry and is kept as closely guarded secret information. Ford Motor Company and Autoliv have at all times, to my knowledge, maintained the confidentiality of the information in these documents.

9. Ford also seeks non-sharing protection over the Subsystem Design Specifications ("SDS") for the Safety Canopy System and the System Design Specifications applicable to the driver's side front window glass and glazing utilized in 2002-2005 Ford Explorer and Mercury Mountaineer (U152) vehicles that Ford contends requires heightened protection and should not be shared outside of this case because they contain highly proprietary and confidential trade secret information relating to current Ford technology, testing, research, and other similar information.

10. SDSs are used to establish design, development and testing requirements for a vehicle's systems and subsystems. These documents also describe, in detail, the methodologies required to objectively achieve compliance by defining design verification methods and acceptance criteria applicable to Ford vehicles. Ford currently and actively uses these materials in its design and development processes and does so outside of specific vehicle programs that have ended or gone out of production

11. Research, design and development methodologies, and testing described or shown in the SDS are undertaken at great expense to Ford. These efforts include thousands of hours of work from Ford engineers who have a high level of specialized experience, education, and training in a particular field of automotive engineering. The automotive industry is highly competitive, and being the first to market a new concept or feature can confer a distinct competitive advantage to an automotive manufacturer, translatable into sales and profits. Research on product concepts may take several years, and the design and development of a new design concept generally takes several years.

12. If Ford's competitors were to gain access to the SDS, they would unfairly gain a competitive advantage against Ford. Such an advantage would consist of using Ford's work in

the development of their own designs and thus to get a product to market sooner than they would have otherwise and/or to get their product to market at a lower cost, since they would not have incurred the substantial research, testing, and developmental costs that Ford had incurred, and since they would have received closely guarded information about Ford's costs and timetables for such designs. Alternatively, whether or not a competitor actually utilized the information in the SDS in developing its own products, possessing information about these materials would give a competitor an advantage in everything from utilizing the research underlying Ford's design concepts in order to apply such research to the competitor's own potential design concepts (whether in comparison or contrast), and/or to undercutting Ford's timetables or costs by working from Ford's information regarding same and/or to developing marketing strategies that would contrast the competitor's own design concepts with Ford's based upon this information.

13. Based upon my background and experience in the automotive industry, and due to the time and expense involved in developing such information, I am aware that it would be extremely difficult and expensive for a competitor of Ford to duplicate the information and material in the SDS that is developed by Ford.

14. Information contained in the SDS is treated as trade secret in the automotive industry and is kept as closely guarded secret information. Ford has at all times maintained the confidentiality of the information in these documents. In fact, at the bottom of each page of the SDS the following statement (or similar statement) is made: "The information contained on this page is Confidential [or proprietary] to Ford Motor Company. Disclosure or distribution to unauthorized persons outside of Ford Motor Company is strictly prohibited."

15. Based upon my background and experience in this job function, I am familiar with the information publicly available in the areas of calibration, test methodology, and Ford's

Safety Canopy System, and the information contained in those documents described above is not known outside of Ford. Such information is treated as trade secret in the automotive industry and is kept as closely guarded secret information. Ford has at all times maintained the confidentiality of the information in these documents.

16. I am aware that Ford carefully works to protect information such as that described in the Safety Canopy and System and Sub-System Design Specification documents from disclosure even within Ford. The work and the documents related to research and testing of new potential designs and of Ford's Safety Canopy® System are considered proprietary, and employees who deal with such information are required to treat such information as confidential. Ford protects the secrecy of the research and testing such as those described in the Safety Canopy documents by creating secure areas within Ford's premises where such research and testing occurs, with controlled access limited to those employees whose job functions require their presence in those areas. Ford further protects the secrecy of such work by practical limitations on the dissemination of the documents to those persons within Ford whose job duties require their knowledge of such documents.

17. In order to protect Ford's proprietary, commercially sensitive information, these documents must be produced where applicable pursuant to a Non-Sharing Protective Order as designated by Ford, respectively.

WHEREFORE, I hereby declare and state, under penalty of perjury according to the laws of the United States and pursuant to 28 USC 1746, that the foregoing statements are true and correct.

9/1/2016

X _{signature}_

Ram Krishnaswami
Design Analysis Engineer
Signed by: rkrishn3

6